# OHIO & MISSISSIPPI RAILWAY COMPANY
## v.
## JOHN D. ALLENDER.

*Railroads—Negligence—Personal Injury—Relation of Passenger—Custom—Contributory Negligence.*

1. Whether or not a person bringing suit against a railroad company to recover for personal injury alleged to have been caused through its negligence, was injured by reason of an apoplectic attack brought on through his own imprudence, is a question of fact for the jury in a given case.

2. A custom, to avail as such, must be certain, uniform, reasonable, and so general as to afford a presumption that parties contracted with reference to it.

O. & M. Ry. Co. v. Allender.

3. If a passenger is injured through boarding a moving train, a sufficient stop having been made for him to have boarded it in safety, such act constitutes contributory negligence and bars a recovery. Proof that others had frequently boarded trains with knowledge of servants of the company operating the train after the fact, without proof of encouragement so to do, would not prove custom or license.

4. A person voluntarily boarding a train, by mounting the front platform of the express car therein with the knowledge that such car is in the exclusive control of the express company, can not place the railroad company in the position of being legally required to do an act which he knew it had no legal right to do, viz., see that the front door of such car was unlocked, so that plaintiff could pass through such car in order to reach a passenger coach in its rear, and this would not be the law, even if the contractual and legal relation of passenger existed at the time.

5. Such contract is subject to modification and change by the agreement or acts of the parties. It implies that a passenger will present himself in the usual and ordinary way, as known to him and provided by the company, to take passage on its train, and thus obtain the full accommodation and safety to his person that was secured by the contract.

6. A person voluntarily going upon the front platform of the express car in a given train, takes upon himself the hazards of his voluntary act, which imposes upon him the exercise of a degree of care commensurate with the risk voluntarily assumed in the ordinary and usual running of the train, he knowing such car to be in the exclusive control of the express messenger.

7. An engineer ordinarily has no right, by his invitation to a person to board his train, to create the relation of passengership.

[Opinion filed June 26, 1893.]

Appeal from the Circuit Court of Clay County; the Hon. Carroll C. Boggs, Judge, presiding.

The appellee lived at Clay City, and on the 23d day of November, 1891, desiring to go from there to Olney, purchased a ticket with the intention of taking the 10:40 A. M. passenger train, but learning, as he claims, from the station agent, that the train was an hour late—(this the agent denies) went back to his house several blocks away to get his dinner. The train was in fact forty-six minutes late. Just after having finished his dinner he heard the train coming, when he ran rapidly to the station, to take the train. This violent exertion tired him considerably. The train had

moved up about two car lengths when appellee reached the railroad track, about which time the engineer inquired if he wanted to board the train, when learning that was desired, the appellee says, "the engineer stopped the train or slowed it up," and said, "get on quick." Appellee said on direct examination, "I went on right up the steps of the platform—meaning the front platform of the express car, next to the tender—and had hardly straightened up when he pulled out as hard as he could go.

Q. Did he look out of the cab toward where you were when you was coming up the road? A. Yes, sir. He was leaning out of the cab.

Q. How far were you away? A. Forty or fifty yards.

Q. What did he do then? A. He stopped the train.

Q. Did you halloo out to him? A. I waved my hand.

Q. Then he stopped the train? A. Yes, sir.

Q. Do you know whether he stopped still? A. I think it was still. It was shaking a little. He had moved the train east. A part of it—the engine—had crossed Main street.

Q. How long after you got on the steps before he turned the steam on? A. I had got off the steps and got on the platform and was holding to the guard rail that goes around the end and facing the engine.

He says he saw the engineer in the cab, but does not recollect whether the engineer saw him or not, though he could have done so, while standing up.

On cross-examination the appellee seems to be inclined to think that the train had started and was moving a little when he got on. The engineer, who testified on behalf of the appellant, says, as he slackened up, appellee got safely on the front platform of the express car. He did not see appellee thereafter. Appellee says he did not call to the engineer thereafter.

Appellee says he stood on the platform until the train had run a short distance, when he tried to open the door of the express car, but could not do so. After the train had

O. & M. Ry. Co. v. Allender.

proceeded about two miles he tried it again, and failed. He says the door would only open a little, but he saw the messenger, who was in his shirt sleeves, putting on his cuffs, look at him, but he made no reply to the request to let him pass through the car. Between these efforts to get through the car, he sat down once on the platform. He says: " I only made two efforts to get through. I told him I was freezing. (The messenger denies all this evidence.) I took hold of the rod of the car going round the end of the car. I held on to that until they threw me off or I fell off. When I came to the curve the train was jostling. I held on as tight as I could. My arms were stiff. My hands and body were cold. My hold gave way and I fell from the train. I went off on the south side of the curve. The train was running about thirty or forty miles an hour."

Q. You say your hands grew numb? A. Yes, and my arms grew numb. My whole body was chilled.

Q. What effect did that have? A. That is what loosened me from the rod. Chilling me is what loosened me from the rod I was holding to. I knew I was falling when my hands came loose. When I felt my hands loosening I fell backwards. I had a faint recollection that I was falling.

The evidence shows that a lantern placed on the rear platform of the rear coach where there is the most swing will not be thrown off, although unfastened. No one of the trainmen except the engineer, knew that appellee got on, or was on the train at any time, or place, or that any one got on the platform of the express at Clay City.

The appellee was bruised some on the left side of the head and body, but no bones were broken. He was carried home and after a time he became paralyzed in the left side. That appellee was badly injured, is clearly proven.

Appellant contends that the facts show, that, being a large man, weighing over two hundred pounds, exhausted by his run to the train, then suddenly becoming chilled, he fell from the train by reason of an apoplectic attack, which was brought on by his own imprudence. There was expert evidence to sustain this theory.

That was, however, a question of fact for the jury, hence the evidence on that point is not set out in detail.

The appellee says the car he got on was immediately behind the tender; that he had on a number of occasions passed through the express car to coaches, and seen others do so, and that the conductor had taken tickets of passengers in such cars. But on this occasion says he did not get on the express car because he had done so before, but because he thought it was safest; the car at the time was jolting back and forth a little.

He further says he had observed the management of express cars for many years, and knew that the messengers had exclusive control of them.

The rules of the company, introduced in evidence, show that the engineers must obey the orders of the conductor in the starting, stopping and management of the trains.

The first count of the declaration alleges, in substance, that appellee purchased a first class ticket, according to above statement, and boarded one of the cars of appellant's passenger train (does not aver which car), but on account of the negligence of appellant in the management and operation of the same, the door of the car he tried to enter was shut, and closed against him, and was by the defendant, carelessly and negligently suffered to remain, and kept closed, so that plaintiff could not get the same open, and could not get into said car or any other car of said train, but on the contrary he was compelled to stand, and remain out on the platform of said car until the happening of the grievances hereinafter complained of.

That simultaneously with his getting onto the platform of said car, and before he had time to alight therefrom, after finding the door of the same closed against him, and without giving him an opportunity to do so, or to get into a place of safety, the defendant, well knowing the plaintiff's position to be one of extreme peril, carelessly, negligently and willfully, began to run said train at such a rate of speed that the plaintiff could not, and was not able to get off said car in safety, and so continued to run the same, not-

withstanding his perilous position was well known to the defendant, at such a willful and furious rate of speed that he was unable to stand, and remain on the platform of said car, but because of the great rate of speed of said car and rocking and jerking of same, occasioned thereby, and while he was using every effort to hold on to said car, he was thrown with great violence and force from the same, onto the ground, and thereby greatly and permanently injured.

The second count alleges the facts substantially according to the statement of facts above set forth, averring that he was misled by the agent as to the time the train was late; that the train slackened in its speed after starting, but did not stop so he could get on, and that he got on the front platform of the express car without knowing what car it was, and that the train pulled out without giving him time to try the door; that he twice tried the door and could not get in, and that while using every effort to hold on, owing to the great rate of speed, etc., he was thrown off, etc.

Messrs. Pollard & Werner and A. J. Lester, for appellant.

Messrs. C. K. Tharp and Cullop & Kessinger, for appellee.

Mr. Justice Sample. It will be observed that the first count of the declaration predicates negligence on, first, the door of the car appellee attempted to enter being closed, and kept closed, so that he could not enter it; second, that the train started at a rapid rate of speed before he could discover said fact, and safely alight from said car; third, that knowing appellee's perilous position, a high and furious rate of speed was continued, whereby, although appellee was using every effort to hold on, he was thrown off and injured.

The second count predicates negligence on, first, the misinformation as to the time the train was late; second, that the train did not stop so that he could get on the passenger coach and therefore got on the platform of the first car without knowing what kind of a car it was; third, that the train

pulled out before time was given to try the door and alight; fourth, that owing to the high rate of speed, appellee was thrown off the platform, as against every effort to remain on the train.

It is material to inquire who kept the door closed so that appellee could not enter the car. The averment is that appellant by its servants kept the door closed. It is undisputed that the messenger in charge of the express car was not a servant of appellant, and was in no way in its employ, but was in the exclusive charge of such car for the Adams Express Company. The business of transporting moneys and other valuables for the public, necessitates privacy, and the exclusion of the public from such front car, as much as from the space inside the railing or counter of a bank. The point is undisputed that the traveling public are excluded from such car, although it also shows that appellee and others had occasionally been admitted. There is no proof, however, that appellant ever assumed the right to admit to such car, any passenger, or in any way invited or encouraged passengers to enter such cars. Under the proof the admission was solely on the part of the messenger of such car, and then in evident violation of the rules of the express company, and there was no other recognition of such right on the part of the railroad company, than the collections of fares from such passengers if known to be there. There is no proof that the conductor or collectors of fares made a business of going through such cars to see if passengers were riding there, or that the railroad company in any way held out to the public, any inducement to board such cars as a proper way to reach the passenger coaches. A custom, to avail as such, must be certain, uniform, reasonable and so general as to afford a presumption that the parties contracted with reference to it. The proof in this case falls far short of showing such contractual right on the part of the appellee.

It is a common practice for belated passengers to get on trains while moving. This is a matter of common observation, and is well known to railroad companies.

If a passenger is injured in so doing, the train being stopped sufficient time for him to have boarded it in safety, the courts uniformly hold that such act is contributory negligence and bars a recovery. Proof that others had frequently boarded trains with knowledge of servants of the railroad company operating the train, after the fact, without proof of encouragement so to do, would not prove custom or license.

The proof in this case shows conclusively, and it is not denied, that appellee knew he was attempting to enter the coaches through the express car. He says he got on the front platform of the first car after the tender, thinking it was more safe to do so than to go to the coaches direct. He does not claim that the engineer invited or suggested that he should get on the express car. He testified that he knew such car was in the exclusive charge of the express messenger. His act was therefore voluntary and intentional, though not very deliberate, as he was late. The stopping of the train by the engineer for appellee's accommodation, enabled him to get on the train. Although the engineer did not invite or suggest to appellee that he should board the train at the express car, yet he knew that appellee did so, and pulled out, without knowing whether appellee did or could get through the express car.

It is insisted by the appellee that such acts of the engineer, coupled with the fact that he had purchased a ticket, created the relation of passenger to the railroad company, with all the rights and privileges offered by such relation, and the train on which he took passage. In order to comply with the law of that relation, it is insisted, it became necessary for appellant to open, or see to it that appellee could open, the front door of the express car.

This is insisted upon as the law, without regard to what the custom was as to passengers passing through such a car. To so hold would be to make such duty paramount to the legal right and duty of the express company to keep the door shut. It is not the law that the appellee, by his voluntary act, with the knowledge he had that such express car

was in the exclusive control of the express company, could place appellant in the position of being legally required to do an act which appellee knew it had no legal right to do. This would not be the law, even if the contractual and legal relation of passenger existed at the time. That contract, like any other, is subject to modification and change by the agreement or acts of the parties. It implied originally that appellee would present himself in the usual and ordinary way, as known to him and provided by appellant, to take passage on its train, and thus obtain the full accommodation and safety to his person that was secured by the contract. By boarding the train at the front end of the express car with the knowledge on his part heretofore stated, he voluntarily selected his own accommodations and mode of conveyance, which of itself was not perilous, and thereby took upon himself the hazard of his voluntary act, which imposed upon him the exercise of a degree of care commensurate with the risk voluntarily assumed in the ordinary and usual running of the train.

Had he boarded the locomotive, by the consent of the engineer, instead of the front platform of the express car, under the same circumstances, even if thereby he would have sustained the relation of a passenger to the appellant, yet is there any question but that he would have voluntarily assumed the ordinary hazard of being able to stay on the locomotive if prudently operated, and would have been required by law to exercise a decree of care proportional to such increased risk?

Had he fallen off while the train was being run in the ordinary manner and been injured he could not have been heard to say that he should not have been permitted to board the locomotive, or that if it had not been run so fast, he would not have been injured.

This case is distinguished from that of L. S. & M. S. R. Co. v. Brown, 123 Ill. 162, in that the train that carried appellee was operated in the usual and prudent way for the transportation of passengers, while in the Brown case the proof was that he was thrown from the foot-board of the

engine by the sudden stopping and starting of the engine in making a running switch, which was dangerous to one who had no notice. Brown had no warning, and therefore did not exercise that extraordinary care the peril imposed.

Had he fallen off the foot-board, while the locomotive was regularly proceeding to its destination, without the sudden jerking required in order to make the running switch, then these cases would be parallel in principle.

The right of recovery in the Brown case, however, is based on the sudden jerking of the locomotive, without warning being given to Brown. In the cases of N. C. R. R. Co. v. Ewing, 3 Am. and Eng. R. R. Cases, 465; Patterson's Railway Accident Law, 204; Pierce on Railroads, 329; Wilton v. M. R. R. Co., 107 Mass. 108; C., B. & Q. R. R. Co. v. Sykes, Admr., 96 Ill. 162; Tutor v. Mansfield Ry. Co., 38 La. Ann. 111, and other cases cited, there was either invitation or conduct on the part of the servants of the railroad companies to induce the party injured to *ignorantly* place himself in a position of peril which resulted in the injury, or the party having done so voluntarily, there was subsequent negligence in the operation of the train on the part of the railroad companies, which was of itself the efficient cause of the injury. This distinction is noted and clearly stated in W. Ry. & T. Co. v. Spacklett, Admx., 19 Ill. App. 145, at p. 148; see also C. & N. W. Ry. Co. v. Reilly, 40 Ill. App. 446.

Had the appellee, while in the position he was permitted to assume, been injured in a wreck caused by the negligence of the company, it may be there would have been, as held in some of the cases cited, a liability on account of the qualified relation he sustained to appellant. But see Abend v. T. H. & I. R. R. Co., 111 Ill. 202. Under the authority of the case of C., B. & Q. R. R. Co. v. Casey, 9 Ill. App. 632, it is held, however, that an engineer ordinarily has no right, by his invitation to a person to board a train, to create the relation of passengership; that such invitation is not in the course of his performance of a duty. This conclusion is reached after a careful and able review of the authorities.

Hence, if it should be held that the act of the engineer

was an invitation to board the express car, under this authority there could be no recovery.

We prefer, however, under the facts of this case, to base our decision upon the qualified relationship of appellee to appellant, growing out of his conduct, under which there was no negligence shown on the part of appellant. The appellee knew the position in which he was placing himself when he mounted the steps of the express car. He knew that it was the first car next to the tender and that it was not a passenger car, and therefore knew that it was not the proper place to enter the train as a passenger, with all the rights and accommodation such relation would afford him. He says he was afraid of getting hurt or being left, if he tried to board a passenger car, the only proper car for him to attempt to enter with the right to claim the full and complete relation of a passenger, and therefore he took the chances of being able to get into the passenger car and thereby place himself in the full relationship of a passenger with the appellant or of accepting the accommodations and the risk of the situation in which he voluntarily placed himself. He was not misled by the engineer or any other servant of the appellant to his injury. How could the appellant be expected to afford him the comfort and security of its passenger cars when he voluntarily placed himself in a position that he could not reach them? The judgment rendered was based upon law not in harmony with the views.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*